IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DELSHJUAN JONES,
a.k.a. Delshaun Jones,   CASE NO. 2:17-CV-192
                         JUDGE GEORGE C. SMITH
    Petitioner,     Magistrate Judge Chelsey M. Vascura

    v.

WARDEN, SOUTHERN OHIO
CORRECTIONAL FACILITY,

    Respondent.

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the *Petition,* Respondent's *Return of Writ*, Petitioner's *Traverse*, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

### I. Facts and Procedural History

The Franklin County (Ohio) Court of Common Pleas summarized the facts of the case as follows:

> On March 8, 2014 an incident involving a stabbing occurred at Schrock Tavern. The victim Samuel Lacy, a security guard at the Schrock Tavern claimed that he was stabbed by a person who he had recognized from the tavern before and knew as a rapper. Ultimately, the police were able to get the defendant's name. Det. Brian Wildman created a six pack photo array that included the defendant. After he interviewed the defendant at the hospital he had Officer Gregory Potter serve as the blind administrator for the array. This interview was audio taped. . . . For the identification Officer Potter followed the procedure he was trained as the blind administrator. Mr. Lacy identified photo number four which was the defendant, indicating I think that's him.

> Thereafter, the defendant was arrested and taken to Columbus Police Headquarters where he was interrogated. In reviewing the rights waiver with the defendant, he admitted to consuming alcohol at 6:30 pm the night before and taking Percocet, 15 mg. between 11:30 pm to 12:00 am. The waiver was signed at 5:54 am. After the defendant had reviewed the rights waiver with the officer he indicated he understood his rights and signed the acknowledgment. He then talked with the officer providing some incriminating statements.

*Entry* (Doc. 6-1, PAGEID ##123-124). Petitioner was indicted by the January 10, 2014, term of the Franklin County grand jury on one count of felonious assault in violation of O.R.C. § 2903.11. (*Id.* at PAGEID #46). After the trial court's denial of Petitioner's motions to suppress evidence, Petitioner entered a no contest plea. (*Id.* at PAGEID #150). On November 21, 2014, the trial court imposed a sentence of seven years of incarceration plus three years of post-release control. (*Id.* at PAGEID ##170-171). Represented by new counsel, Petitioner pursued a timely appeal. He raised the following assignments of error:

> [I.] The trial court erred when it overruled defendant's Motion to Suppress Identification.
>
> [II.] The trial court erred when it overruled the defendant's Motion to Suppress Statements.
>
> [III.] The trial court abused its discretion when it submitted a judgment entry that did not accurately reflect what occurred at the plea hearing.

*State v. Jones,* No. 14AP-1050, 2015 WL 7902800, at *1 (Ohio App. 10th Dist. Dec. 3, 2015). On December 3, 2015, the appellate court sustained Petitioner's third assignment of error, as the parties agreed "that the judgment entry signed by the trial court judge is incorrect when it states that Delshjaun Jones was convicted following a guilty plea" and remanded the case to the trial court to journalize a *nunc pro tunc* entry reflecting that Petitioner was found guilty following a

plea of "no contest." *Id.* The appellate court otherwise affirmed the judgment of the trial court. *Id.* On May 4, 2016, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Jones,* 145 Ohio St.3d 1458 (2016). On December 11, 2015, the trial court issued the *Amended Judgment Entry.* (*Id.* at PAGEID #316).

On March 6, 2017, Petitioner filed this *pro se* § 2254 *Petition.*[1] He asserts that he was denied a fair trial due to admission of identification testimony obtained through the use of an unduly suggestive photo array conducted in violation of state law (claim one); and that his statements were admitted in violation of *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (claim two). Respondent contends that Petitioner's claims lack merit.

## II. Standard of Review

Petitioner seeks habeas relief under 28 U.S.C. § 2254. The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth standards governing this Court's review of state-court determinations. The United State Supreme Court described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) (AEDPA imposes a highly deferential standard for evaluating state court rulings and demands that state court decisions be given the benefit of the doubt).

The factual findings of the state appellate court are presumed to be correct. Section 2254(e)(1) provides as follows:

---

[1] Petitioner indicates that, on February 24, 2017, he submitted the *Petition* to prison officials for mailing. *Petition* (ECF No. 1, PAGEID #11).

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

"Under AEDPA, a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir.) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)), *cert. denied sub. nom Coley v. Robinson*, 134 S. Ct. 513 (2013); 28 U.S.C. § 2254(d)(1); 28 U.S.C. § 2254(d)(2) (a petitioner must show that the state court relied on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding"). The United States Court of Appeals for the Sixth Circuit explained these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405[] (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id*. at 407[].

*Coley*, 706 F.3d at 748–49. The burden of satisfying the standards set forth in § 2254 rests with the petitioner. *Cullen v. Pinholster*, 563 U.S.170, 181 (2011).

"In order for a federal court to find a state court's application of [Supreme Court precedent] unreasonable, . . . [t]he state court's application must have been objectively unreasonable," not merely "incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520–21, (2003) (internal quotation marks omitted) (citing *Lockyer v. Andrade,* 538 U.S. 63, 76 (2003); *Williams*, 529. U.S. at 409); *see also Harrington*, 562 U.S. at 778 ("[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision")(quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In considering claims of "unreasonable application" under § 2254(d)(1), courts must focus on the reasonableness of the result, not on the reasonableness of the state court's analysis. *Holder v. Palmer,* 588 F.3d 328, 341 (6th Cir. 2009) ("'[O]ur focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not whether the state court considered and discussed every angle of the evidence'") (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*), *cert. denied sub. nom. Neal v. Epps*, 537 U.S. 1104 (2003)); *see also Nicely v. Mills*, 521 F. App'x 398, 403 (6th Cir. 2013) (considering evidence in the state court record that was "not expressly considered by the state court in its opinion" to evaluate the reasonableness of state court's decision). Relatedly, in evaluating the reasonableness of a state court's ultimate legal conclusion under § 2254(d)(1), a court must review the state court's decision based solely on the record that was before it at the time it rendered its decision. *Pinholster*, 563 U.S. at 181. Put simply, "review under § 2254(d)(1) focuses on what a state court knew and did." *Id.* at 182.

## A. Claim One

In claim one, Petitioner asserts that police failed to follow the procedures required under state law when obtaining a photo identification of him from the alleged victim Samuel Lacy, resulting in an unduly suggestive identification. According to Petitioner, Lacy's identification of him was unreliable, as Lacy had little to no opportunity to view his assailant at the time of the offense, paid limited attention, provided a vague description of the perpetrator to police, and was uncertain of his identification of Petitioner. The state appellate court rejected this claim as follows:

> The trial court . . . overruled a motion to suppress identification and a motion to suppress statements. The motions were overruled following an evidentiary hearing, which revealed that someone stabbed or slashed Samuel Lacy, seriously injuring Lacy's face. Lacy felt he knew the identity of his assailant, a young man called "Deli" who came into the Schrock Tavern where Lacy worked. Columbus police officers who investigated the assault concluded that the assailant was Delshjaun Jones and prepared a photo array.
>
> ***
>
> The [] issue is whether the identification of Jones as the assailant by Samuel Lacy should have been suppressed as evidence. The CD of the interview of Lacy by police detectives and of the presentation of the photo array to Lacy for him to identify his assailant is consistent with the trial court's overruling of the motion to suppress. Lacy was clearly certain that he knew his assailant from the assailant's frequent visits to the Schrock Tavern. Lacy recognized the nickname "Deli" as applying to his assailant.
>
> Lacy identified two photos of the six in the array as pertinent to the investigation. The photo in the slot marked "6" he identified as being a friend of the assailant. The photo in the slot number "4" he identified as being a photo of the assailant. The procedure was not suggestive and therefore has [sic] not the basis for suppressing the identification testimony had this been a trial.
>
> The first assignment of error is overruled.

*State v. Jones*, 2015 WL 7902800, at *1-2.

To the extent that Petitioner raises a claim regarding the alleged violation of state law, his claim fails to provide a basis for relief. Federal courts can grant habeas corpus relief only if the petitioner is confined in violation of the United States Constitution. 28 U.S.C. § 2254(a); *e.g., Wilson v. Corcoran*, 562 U.S. 1, 5 (2010). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

However, identification testimony based upon a pre-trial procedure that is so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" violates a criminal defendant's right to due process. *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). "It is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). The Court first must determine whether the pre-trial identification procedure employed was unduly suggestive. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070–71 (6th Cir. 1994), *cert. denied*, 515 U.S. 1145 (1995). If so, the Court must then consider the totality of the circumstances in order to determine whether the identification is nevertheless reliable. *Id.* at 1070 (citing *Neil v. Biggers*, 409 U.S. at 199–200; *United States v. Hill*, 967 F.2d 226, 230 (6th Cir.), *cert. denied*, 506 U.S. 964 (1992); *Thigpen*, 804 F.2d at 895). In making this determination, the Court must consider the following five factors:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of observation; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when confronting the defendant; and (5) the length of time between the crime and the confrontation.

*Ledbetter*, 35 F.3d at 1070 (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Neil v. Biggers*, 409 U.S. at 199–200).

Here, Officer Brian Wildman testified that, on March 8, 2014, he was contacted about a stabbing at the Schrock Tavern and given Petitioner's name as the suspect. He assembled a photo lineup which included Petitioner's photograph, and went to the hospital in order to interview Samuel Lacy, the alleged victim. *Transcript of Suppression Hearing* (Doc. 6-2, PAGEID # 338). Wildman gave the photo array to a "blind administrator," *i.e.*, an officer who did not know the identification of the suspect. (*Id.* at PAGEID #340). Lacy told police he had had prior dealings with his assailant. "It was clear he had dealt with the person before." Lacy did not know the name of his attacker, but was clearly familiar with the man. (*Id.* at PAGEID #341). Lacy described him as a light skinned black male, approximately six feet two inches tall, with large lips and "he mentioned something about his eyebrows." (*Id.* at PAGEID #342). Wildman recorded the interview with Lacy, and it was played during the hearing on the motion to suppress evidence. (*Id.* at PAGEID #345). The recording indicated that Lacy was working security at the Schrock Tavern on the night he was attacked.

> And there was a group of females come in. I patted them down . . . .
>
> ∗∗∗
>
> Searched the purses. So there was a pause for a second. Then nobody come in and there was another group of dudes coming in that came in and everything. Dude had a knife on him . . . . I patted him down . . . . okay, he had it on this side. He had a knife on this side. He had a can of mace on this side in his jacket. I said you have to go back to the car, take it out to your car. He said, all right.
>
> And then like three or four other people come in, I patted them down . . . . And then there was a quick pause. Because I wasn't

8

> standing that close to the door and I was five feet away from [the front] door . . . .
>
> And so when he came in, he just – (indicating) – hit me. I'm like, oh, this mother fucker.
>
> ***
>
> I had my back completely turned and he hit me. I don't know if it was a box cutter or a knife.

(*Id.* at PAGEID ##348-349). Lacy recognized his assailant as a rapper who had frequented the club in the past. (*Id.*). The man usually came to the club with "his boys," whom Lacy also recognized. (*Id.*). Lacy recognized the nickname, "Deli," but said the man also went by another name. (*Id.* at PAGEID #349). Lacy described him as a black male with light skin, a couple inches taller than himself. Lacy could recognize him if provided with a photograph. (*Id.* at PAGEID #350). "Uh-huh. Can't miss him. He got big lips and – (inaudible) – eyebrows. – (inaudible)—he got some tattoos and stuff. You know what I mean? You can't miss him." (*Id.*). Officer Wildman was not present when Lacy identified Petitioner from the photo array. (*Id.* at PAGEID ##400, 410).

Officer Gregory Potter also responded to the Schrock Tavern and followed Lacy to Riverside Hospital. (*Id.* at PAGEID #416). Potter showed the photo array provided by Officer Wildman to Lacy and asked Lacy if he could identify the person who had assaulted him at the bar. (*Id.* at PAGEID #417). Potter did not know, at that time, the identity of the suspect. (*Id.* at PAGEID ##417-418). An audiotape was made of the identification procedure, which was played during the hearing on the motion to suppress. It indicates that Potter instructed Lacy as follows:

> The photo array you're about to view consists of six photographs in no particular order of importance. The subject of his investigation may or may not be included in the photographs. I do not know who the subject of this investigation is. Look carefully

at the photographs of all six people then advise me whether or not
you recognize anyone.  You are not required to select a photo.

(*Id.* at PAGEID #421).  Lacy identified photograph number six as "one of the dudes's he's connected with" and photograph number four, or Petitioner's photograph, as the person who cut him.  (*Id.* at PAGEID ##421-422).  Lacy stated, "I want to be sure.  I don't want to mess up.  Make sure I get the right person.  That's got to be him then.  Because I remember – I seen him before throwing him out the club."  (*Id.* at PAGEID #422).

> DETECTIVE:  So number six you've seen before.
>
> MR. LACY:[2]  Yeah.  I know – I've seen him before, but – I think that's him.  It happened so fast, bro.
>
> THE DETECTIVE:  Number four is the one from –
>
> MR. LACY:  From this, yeah.
>
> THE DETECTIVE:[3]  Did that to you?  Cut you?
>
> THE DEFENDANT:  Yes.  Uh-huh.
>
> THE COURT:  Okay.

(*Id.*).  Potter denied making any suggestive remarks regarding the identification of the suspect. (*Id.* at PAGEID ##422-423).  The photo array also was entered into evidence and has been made a part of the record before this Court.  (*See Id.* at PAGEID #322; ECF No. 19).

Petitioner argues that the state appellate court's decision denying his claim constitutes an unreasonable determination of the facts in light of the evidence presented because police improperly provided Lacy with Petitioner's name and put his name beneath his photograph on

---

[2] The transcript refers to Lacy as "the defendant" at this point; however, this appears to be a typographical error.
[3] The transcript refers to the detective as "the court" at this point.  Again, however, this appears to be a typographical error.

the photo array during the time that Lacy made his identification. *Traverse* (ECF No. 10, at PAGEID #536). He further contends that Lacy identified another person prior to identifying Petitioner as the perpetrator of the offense. (*Id.* at PAGEID #539). However, the record does not support these allegations. The record does not indicate that the photo array was unduly suggestive, and it contains no evidence of any improper or suggestive conduct on the part of the police. Likewise, the record does not support Petitioner's claim that police put Petitioner's name underneath his photograph when they asked Lacy to make an identification. Petitioner has failed to rebut the presumption of correctness afforded to the state court's factual findings in this regard. Lacy recognized Petitioner, knew him from prior contacts, and made his identification on this basis. This Court has reviewed the photographic array used by police. It does not indicate that police identified Petitioner's photograph and does not appear unduly suggestive in any other respect.

Claim one is without merit.

**B. Claim Two**

In claim two, Petitioner asserts that the trial court improperly admitted his statements to police as obtained in violation *Miranda*. Petitioner states that he was intoxicated and under the influence of alcohol and Percocet when police interviewed him and therefore did not knowingly, intelligently, or voluntarily waive his *Miranda* rights. Petitioner maintains that he twice requested to terminate the interview, but the police improperly failed to honor his requests and illegally continued to question him. Petitioner argues that the videotape of his interview with police will support his claim that the appellate court unreasonably applied federal law when it rejected his claim, as it shows that his speech was slurred, he had difficulty staying awake, and that he told police he felt "pretty faded" at the time.

The state appellate court denied Petitioner's claim, reasoning in relevant part as follows:

> Police also found and interviewed Jones. Jones executed a standard rights waiver. Jones indicated that he had taken Percocet and downed about a half liter of vodka prior to being asked to waive his various rights. Jones indicated that he understood his rights and was willing to speak to police without the benefit of counsel and without invoking his right to remain silent before starting the interview. However, part way through the interview, Jones indicated a reticence to talk. The officer questioning Jones continued asking questions anyway.
>
> A different police officer was involved in transporting Jones from the after hours place where Jones was arrested to police headquarters for questioning. This officer, Officer Mrsnik, testified that while on the way to police headquarters and in reference to no questions, Jones said "All this for a fight," or words to that effect.[4]
>
> The words uttered by Jones during his time in the cruiser while being transported were clearly uttered voluntarily and therefore were admissible against him had the case proceeded to a trial. The trial court judge was correct to overrule the motion to suppress statements with respect to those words.
>
> The admissibility of all or part of the interview of Jones at police headquarters is more problematic, especially the parts of the interview which followed what could be construed as an attempt by Jones to invoke his right to remain silent. That interview was recorded in its entirety and the recording is in the record before us on appeal. At the beginning of the CD, Jones indicates that he had had a liter or a half liter of vodka within the last 12 to 24 hours. He also acknowledges having one or more 15mg tablets of Percocet. Yet, he speaks coherently, if relatively slowly, throughout the interview. Given the demeanor of Jones displayed in the CD the trial court could reasonably conclude that Jones began the interview with a knowing, intelligent and voluntary waiver of his Fifth Amendment rights.
>
> The rights waiver reviewed with Jones indicated that Jones could stop answering questions at any time. This leads to the second inquiry, namely whether or not Jones invoked his right to stop answering questions part way through the interview.
>
> Once Jones was informed that he had already been charged with felonious assault and that he was going to jail, his demeanor

---

[4] Petitioner does not challenge the admissibility of his statements to Officer Mrsnik.

12

> changed. He acknowledged that he had had a fight with his brother earlier in the evening, but became reticent to talk about his encounter with Samuel Lacy. Still, he acknowledged being at Schrock Tavern and having an encounter with security personnel at the tavern.
>
> Being reticent to talk to police is not the same as invoking the right to remain silent. Jones seemed to want to stop the interview but never stopped answering questions. His desire to end the interview was never clearly communicated such that the trial court could find that Jones had invoked his right to remain silent. We cannot say the trial court erred in allowing the entire interview to be construed as being admissible had there been a trial.
>
> The second assignment of error regarding the suppression of the statements made at police headquarters is overruled and during the transporting is overruled.

*State v. Jones*, 2015 WL 7902800, at *1-2.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The privilege against self-incrimination prohibits the government from using any statement against a criminal defendant "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "[B]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. A person being questioned in a custodial interrogation must be warned "that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." *Id*. A suspect subject to custodial interrogation may waive his *Miranda* rights, "provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda,* 384 U.S. at 444. Waiver depends on the particular facts and circumstances of the case, including the background,

13

experience, and conduct of the accused. *See Bush v. Warden, S. Ohio Corr. Facility*, 573 F. App'x 503, 510 (6th Cir. 2014) (citing *Edwards v. Arizona*, 451 U.S. 477, 483 (1981).

> If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

*Miranda,* 384 U.S. at 444–45. "[T]he suspect must unambiguously request counsel." *Davis v. United States*, 512 U.S. 452, 459 (1994).

> Although a suspect need not "speak with the discrimination of an Oxford don," post, at 2364 (SOUTER, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Id*. Where a suspect's request to cease questioning is "ambiguous or equivocal," cessation of questioning is not required. *See Tolliver v. Sheets*, 530 F. Supp. 2d 957, 994 (S.D. Ohio 2008) (citing *Calhoun v. McKee*, No. 05-74614, 2007 WL 1452911 (E.D. Mich May 15, 2007) (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994))). The defendant must clearly and unequivocally assert his right to silence before police are required to stop questioning him. *United States v. Hurst*, 228 F.3d 751, 759-60 (6th Cir. 2000). Additionally, *Miranda* does not prohibit the admission of voluntary statements made while an accused is in police custody in the absence of express police questioning or its equivalent. *United States v. Murphy*, 107 F.3d 1199,

1204 (6th Cir.1997) ("where a defendant makes a voluntary statement without being questioned or pressured by an interrogator, the statements are admissible despite the absence of *Miranda* warnings"). The United States Court of Appeals for the Sixth Circuit has held that, absent coercion, a waiver will be deemed voluntary even where the defendant was under the influence of an intoxicating medication or had been drinking heavily at the time. *United States v. Miller*, 562 F. App'x 272, 290 (6th Cir.) (citing *United States v. Dunn*, 269 F. App'x 567, 572 (6th Cir. 2008)), *cert. denied sub. nom. Dorsey v. United States*, 135 S. Ct. 184 (2014).

> Other circuits, in likewise upholding *Miranda* waivers, have done so despite drug impairment. *See, e.g., United States v. Burson*, 531 F.3d 1254, 1258 (10th Cir. 2008) ("[D]efendant must be impaired to a substantial degree to overcome his ability to knowingly and intelligently waive his privilege against self-incrimination."); *United States v. Cristobal*, 293 F.3d 134, 143 (4th Cir. 2002) ("Medical records indicating that a suspect had been given narcotics, with no supporting evidence as to the effects of those narcotics (on the individual or even in general) are not sufficient to render a waiver of *Miranda* rights unknowing or unintelligent."); *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990) ("Intoxication and fatigue do not automatically render a confession involuntary; rather, the test is whether these mental impairments caused the defendant's will to be overborne.") * * * [T]he Tenth Circuit held that a hospitalized defendant recovering from gunshot wounds and laboring under the influence of a painkiller, but who nonetheless was "alert and responsive" during questioning, knowingly and intelligently waived his rights. *United States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002).

*United States v. Montgomery*, 621 F.3d 568, 573-74 (6th Cir. 2010). In cases involving *Miranda* waivers by intoxicated defendants, "courts examine the 'totality of the circumstances,' including the suspect's 'age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.'" *Id*. at 573 (quoting *Fare v. Michael C.*, 442 U.S.

15

707, 725 (1979)). A statement obtained by police in violation of *Miranda* is subject to the harmless error doctrine. *Tolliver*, 530 F. Supp. 2d at 994 (citing *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)).

Officer Brian Wildman interviewed Petitioner at police headquarters at approximately 5:52 a.m.. *Transcript* (ECF No. 6-2, at PAGEID ##342, 389). He did not notice anything unusual about Petitioner's behavior or demeanor at that time. *Id.*

> He appeared . . . fine to me. We went over the questions at the bottom of the constitutional rights waiver form. He indicated he had been drinking, but he did not appear intoxicated to me. I thought he was lucid. . . . I couldn't smell the odor of alcohol[.]

*Id*. The videotape of that interview was played during the hearing on the motion to suppress evidence. Petitioner indicated that he had been advised of his *Miranda* rights many times previously. (*Id.* at PAGEID #358). He had a high school education. (*Id.*) He had consumed a half liter of vodka and stated, "I am intoxicated right now." (*Id.* at PAGEID #359). "Like, I'm, I'm pretty faded, you know, this, this'll wake you up a little bit, you know; but I'm there and I ain't about to throw up or pass out or nothing." (*Id.* at PAGEID #360). He said he understood all the questions. (*Id.*). He had taken 15 mg. of Percocet between 11:30 and 12:00. (*Id.* at PAGEID ##360-361). Wildman advised him of his *Miranda* rights. Petitioner repeatedly indicated that he understood. (*Id.* at PAGEID ##361-362). Before making any statements, he asked to be advised of the charges against him. Wildman informed him that he had been charged with felonious assault. (*Id.* at PAGEID #363). Petitioner stated that he had gotten into a fight with his brother earlier in the evening. (*Id.* at PAGEID #364).

> THE DETECTIVE: Every officer that's brought you up here keeps saying you admit you got into an altercation with some bouncers and that was it.
>
> THE DEFENDANT: Yeah. I'm always fighting, you know, like, I'm a fighter, like. You know what I'm saying? Like, I told them that, yeah, it's like at the club I was at, I got into this whole thing with – (inaudible) – some dog like that.

(*Id.* at PAGEID #365). He had been at the Schrock Tavern and acknowledged that he had had problems with security there in the past. (*Id.* at PAGEID #366).

> I don't know, man. I don't even really know if I want to talk. I'm already going to jail, like. Ain't nothing I'm going to say right now to get me out of here. They didn't even tell me that I was charged with nothing or anything. They just say I had to come in here and talk to you and now you telling me I'm charged.
>
> \*\*\*
>
> THE DEFENDANT: And I'm already going to jail, like. So I really –
>
> THE DETECTIVE: I'm trying to get your explanation for –
>
> THE DEFENDANT: (Inaudible) – I understand.
>
> THE DETECTIVE: \* \* \* I'm just trying to get your explanation for what occurred . . . .

(*Id.* at PAGEID #367). Petitioner then indicated that a couple of men had grabbed him and told him that he could not go into the bar. (*Id.* at PAGEID ##367-368). He turned around and swung. (*Id.* at PAGEID #368). He denied using a knife. "I don't understand why this is felonious assault. I break his jaw?" (*Id.* at PAGEID #369).

> THE DETECTIFVE: You cut him with a knife.
>
> THE DEFENDANT: I ain't cut him with no knife.

17

> THE DETECTIVE: You cut him with a knife. It's right on tape, dude.
>
> THE DEFENDANT: I ain't have no knife.
>
> \*\*\*
>
> THE DETECTIVE: He's split open. You want me to go get a picture of it?
>
> THE DEFENDANT: Yeah. I didn't have no knife, though. Honestly. I have no knife. It may have been my ring. I ain't have no knife. I don't need to use no knife. I fight all the time. Look at my hands, man, beat up. My knuckles swollen and everything, man, from punching on dude and stuff, man.
>
> THE DETECTIVE: You're just saying you threw a punch and cut him?
>
> THE DEFENDANT: \* \* \* Yeah. I didn't cut him. I ain't have no knife.

(*Id.* at PAGEID ##369-370). Petitioner admitted throwing a couple of punches, but repeatedly denied using a knife. (*Id.* at PAGEID ## 371, 373, 385, 387).

This Court has reviewed the entire record, including the videotape of the interview with police. Petitioner appears to be lucid and coherent and to understand what is happening. He indicates that he understands. His speech is not slurred. He asks appropriate questions. Although he mentions that he has no reason to speak with police, because they have already decided to file charges against him, he never requests counsel or indicates that he wishes to cease the police interview. To the contrary, he continues responding to questions and asking questions of his own. As discussed, he denies use of a knife repeatedly. The police did not engage in coercive tactics. The totality of the circumstances supports the state court's conclusion that Petitioner knowingly, intelligently, and voluntarily waived his *Miranda* rights and agreed to speak with police. Moreover, the record does not indicate that he ever clearly and unequivocally

18

indicated that he no longer wished to speak to police or asserted his right to remain silent. In view of this record, Petitioner has failed to establish that relief is warranted.

Claim two is without merit.

### III. Recommended Disposition

Therefore, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

### IV. Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

> /s/ *Chelsey M. Vascura*
> CHELSEY M. VASCURA
> UNITED STATES MAGISTRATE JUDGE